**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

CHINA UNITED LINES, LTD, a China company,

        Plaintiff,

    v.

AMAZON.COM SERVICES LLC, a Delaware limited liability company,

        Defendant.

Civil Action No. 1:23-cv-10313-PKC

Hon. Judge P. Kevin Castel

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS .............................................................................................. 3

    I.    The Contractual Relationship ........................................................................... 3

    II.    CUL Repeatedly Violates the No-Publicity Provisions. ................................... 6

    III.    CUL's Consent Requests and Amazon's Repeated Denials. ............................ 7

    IV.    Amazon's Termination of the Agreement. ....................................................... 8

PROCEDURAL HISTORY ............................................................................................. 9

LEGAL STANDARD ...................................................................................................... 9

ARGUMENT ................................................................................................................. 10

    I.    Undisputed facts establish that CUL breached the publicity provision and Amazon
    properly terminated for cause ........................................................................ 11

    II.    CUL's arguments do not create a material dispute of facts that undermine the contracts'
    unambiguous language ................................................................................... 13

        A.    CUL's argument that the Section 7 heading restricts the Publicity Provision to
        confidential information fails under settled principles of contract interpretation ................. 13

        B.    CUL's extra-contractual theories fail as a matter of law. ............................ 18

        (1)    CUL's extra-contractual theories are unpleaded and cannot be raised at the
        summary judgment stage ............................................................................... 19

        (2)    Even if properly pleaded, each extra-contractual theory is meritless. .................. 20

        i.    *CUL's estoppel theory fails as a matter of law.* ........................................... 20

        ii.    *CUL's implied covenant of good faith and fair dealing argument is meritless.* ........ 22

        iii.    *CUL's waiver theory fails as a matter of law.* ....................................... 23

        iv.    *CUL's election of remedies theory also fails.* ....................................... 25

CONCLUSION ............................................................................................................. 25

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*AB Green Gansevoort, LLC v. Peter Scalamandre & Sons, Inc.*,
102 A.D.3d 425 (1st Dep't 2013) ...................................................................................14

*Am. Woolen Co. of N.Y. v. Samuelsohn*,
226 N.Y. 61 (1919) .........................................................................................................25

*Augienello v. Coast-To-Coast Fin. Corp.*,
64 F. App'x 820 (2d Cir. 2003) ......................................................................................19

*Bank of New York Mellon Trust Co., N.A. v. Merrill Lynch Capital Servs., Inc.*,
99 A.D.3d 626 (1st Dep't 2012) .....................................................................................14

*Callahan v. Glob. Eagle Ent. Inc.*,
No. 18-CV-8343, 2019 WL 2325903 (S.D.N.Y. May 30, 2019) ............................................16

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)........................................................................................................10

*Coniber v. Ctr. Point Transfer Station, Inc.*,
137 A.D.3d 1604 (4th Dep't 2016)..................................................................................23

*Contour Design, Inc. v. Chance Mold Steel Co.*,
No. 09-cv-451, 2011 WL 6300622 (D.N.H. Dec. 16, 2011) (rev'd on other
grounds) .........................................................................................................................15

*Desly Int'l Corp. v. Spartak*,
No. 13-cv-2303, 2016 WL 4532113 (E.D.N.Y. Aug. 29, 2016) ...............................................12

*ESPN, Inc. v. Off. of Comm'r of Baseball*,
76 F. Supp. 2d 383 (S.D.N.Y. 1999)...............................................................................25

*Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*,
7 N.Y.3d 96 (2006) .................................................................................................23, 24

*Gaia House Mezz LLC v. State St. Bank & Tr. Co.*,
720 F.3d 84 (2d Cir. 2013)......................................................................................20, 21

*Galli v. Metz*,
973 F.2d 145 (2d Cir. 1992)............................................................................................15

*Greenfield v. Philles Records, Inc.*,
98 N.Y.2d 562 (2002) .....................................................................................................10

iii

*Greenidge v. Allstate Insurance Co.*,
446 F.3d 356 (2d Cir. 2006)...................................................................................19, 20

*Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*,
748 F.2d 729 (2d Cir. 1984).........................................................................................21

*Homapour v. Harounian*,
200 A.D.3d 575 (1st Dep't 2021) .................................................................................23

*In Touch Concepts, Inc. v. Cellco P'ship*,
949 F. Supp. 2d 447 (S.D.N.Y. 2013).........................................................................10

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.*,
309 F.3d 76 (2d Cir. 2002)...........................................................................................16

*Jill Stuart (Asia) LLC v. Sanei Int'l Co.*,
548 F. App'x 20 (2d Cir. 2013) ...................................................................................10

*JLM Couture, Inc. v. Gutman*,
24 F.4th 785 (2d Cir. 2022) .............................................................................12, 13, 15

*JN Contemporary Art LLC v. Phillips Auctioneers LLC*,
29 F.4th 118 (2d Cir. 2022) .........................................................................................22

*Kavanaugh v. Kavanaugh*,
200 A.D.3d 1568 (4th Dep't 2021)...............................................................................25

*Kosakow v. New Rochelle Radiology Assocs., P.C.*,
274 F.3d 706 (2d Cir. 2001)..........................................................................................20

*Major Oldsmobile, Inc. v. Gen. Motors Corp.*,
101 F.3d 684, 1996 WL 280452 (2d Cir. 1996) ..........................................................22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)......................................................................................................10

*Mohr-Lercara v. Oxford Health Ins., Inc.*,
No. 18-cv-1427, 2022 WL 524059 (S.D.N.Y. Feb. 22, 2022) ...................................17

*Music Royalty Consulting, Inc. v. Reservoir Media Mgmt., Inc.*,
No. 18-cv-9480, 2019 WL 1950137 (S.D.N.Y. Apr. 17, 2019) ..................................21

*Muzak Corp. v. Hotel Taft Corp.*,
1 N.Y.2d 42 (1956) .......................................................................................................16

*New York Skyline, Inc. v. Empire State Bldg. Co. LLC*,
No. 651148/2013, 2014 WL 769895 (Sup. Ct., N.Y. Cnty. Feb. 25, 2014) ...............12

*Nuance Commc'ns, Inc. v. IBM*,
    544 F. Supp. 3d 353 (S.D.N.Y. 2021) *aff'd*, 2022 WL 17747782 (2d Cir. 2022) ..................................................................................................................21

*PRCM Advisers LLC v. Two Harbors Inv. Corp.*,
    No. 20-cv-5649, 2021 WL 2582132 (S.D.N.Y. June 23, 2021) ..................................23, 24, 25

*Red Cat Holdings, Inc. v. Autonodyne LLC*,
    No. 2022-0878-NAC, 2024 WL 342515 (Del. Ch. Jan. 30, 2024)..........................................14

*Refinemet Int'l Co. v. Eastbourne N.V.*,
    815 F. Supp. 738 (S.D.N.Y. 1993), *aff'd*, 25 F.3d 105 (2d Cir. 1994) ...................................22

*Rojo v. Deutsche Bank*,
    487 F. App'x 586 (2d Cir. 2012) ...........................................................................................20

*Seiden Assocs., Inc. v. ANC Holdings, Inc.*,
    959 F.2d 425 (2d Cir. 1992)...................................................................................................10

*Sterling Drug Inc. v. Bayer AG*,
    792 F. Supp. 1357 (S.D.N.Y. 1992).......................................................................................12

*Suthers v. Amgen Inc.*,
    441 F. Supp. 2d 478 (S.D.N.Y. 2006).....................................................................................23

*Thomas E. Hoar, Inc. v. Sara Lee Corp.*,
    164 F.3d 619, 1998 WL 667836 (2d Cir. 1998) .....................................................................22

*In re Vebeliunas*,
    332 F.3d 85 (2d Cir. 2003).....................................................................................................21

*VKK Corp. v. Nat'l Football League*,
    244 F.3d 114 (2d Cir. 2001)...................................................................................................17

*W.W.W. Assocs., Inc. v. Giancontieri*,
    77 N.Y.2d 157 (1990) .......................................................................................................10, 18

**Statutes**

N.Y. Gen. Oblig. Law § 15-301(1).................................................................................................24

**Other Authorities**

Fed. R. Civ. P. 56(a) ......................................................................................................................10

23 Williston on Contracts § 63:22 (4th ed. 2021)..........................................................................22

Defendant Amazon.com Services LLC ("Amazon") respectfully submits this memorandum of law in support of its motion for summary judgment, seeking dismissal of the sole remaining Cause of Action in the Second Amended Complaint ("SAC") filed by Plaintiff China United Lines, Ltd. ("CUL").

## PRELIMINARY STATEMENT

Amazon and CUL are two sophisticated entities that negotiated and entered a set of transportation contracts under which millions of dollars would change hands over a two-year term. Amazon was expressly entitled to terminate the contracts for cause upon CUL's violation of multiple provisions relevant here—including a self-captioned "Publicity" provision—that provide CUL "will not use Amazon's trade name, trademark, service mark, logo, commercial symbol, or any other proprietary rights without Amazon's prior written consent." This requirement is not qualified by any confidentiality trigger, nor is it limited to nonpublic information. It requires one thing: Amazon's "prior written consent" before using Amazon's name to publicize the relationship outside of the mechanics of the shipping relationship, which were authorized in writing. CUL never obtained that consent to publicize Amazon's name in CUL's advertising—a fact CUL does not and cannot dispute.

Recognizing that it needed Amazon's "prior written consent" to actively promote its commercial relationship with Amazon, CUL asked Amazon for consent to do so on multiple occasions. Each time, Amazon refused. Notwithstanding Amazon's repeated denials, CUL on multiple occasions advertised its relationship with Amazon on various social media channels in direct violation of the contracts' plain and undisputed terms. Under the plain and undisputed terms of the contract, CUL's conduct gave Amazon the right to terminate the agreement for cause.

CUL's sole remaining cause of action alleges that Amazon's termination for cause after it discovered CUL's violations was wrongful. CUL's central interpretive theory—that the word

1

"Confidentiality" in the heading of Section 7 limits the Publicity Provision to nonpublic information—contradicts the plain language of the contract, is inconsistent with multiple canons of contract interpretation, and is irreconcilable with case law that has found materially indistinguishable provisions "in no way ambiguous."

CUL also presents several extra-contractual arguments in an attempt to justify CUL's non-compliance with the contracts' clear terms. All of these arguments are unpleaded and were raised for the first time in motion papers and should not be considered. CUL cannot amend its Complaint through motion or pre-trial papers. Regardless, these theories are independently unavailing.

CUL's estoppel argument—that Amazon's initial notice of termination for convenience constituted a misrepresentation that CUL relied upon, preventing Amazon from subsequently terminating for cause—misapplies the facts and law. The contracts remained in effect until Amazon terminated for cause because Amazon never terminated for convenience, Amazon gave *notice* of its intent to terminate for convenience, then, during the notice period, discovered the misuse of its trade name in advertising by CUL and elected to terminate for cause. CUL could not have reasonably relied on Amazon's failure to discover CUL's repeated violations of the Contracts.

CUL's implied covenant theory is meritless because motive is irrelevant where a party exercises an express right in accordance with the contract, and the undisputed facts show that Amazon exercised a valid for-cause termination right upon discovering CUL's breaches.

CUL's waiver theory fails because Amazon's *failure to act* in response to CUL's conduct cannot support a claim that Amazon affirmatively waived its rights under the Contracts, particularly where the contracts contain a no-waiver clause.

CUL's "election of remedies" theory fails because Amazon's failure to object to CUL's

actions would, at most, constitute an election to the particular conduct (here, CUL's hanging of a banner welcoming Amazon during a joint reception at a secure shipping terminal). Amazon's alleged "election" would not apply to "other, subsequent, [CUL] breaches."

CUL's contemporaneous conduct further erodes its arguments. CUL formally sought Amazon's consent to publicize, was denied, acknowledged those denials internally, assured Amazon it would comply, and then published anyway. Summary judgment should be entered in Amazon's favor.

**STATEMENT OF FACTS**

**I.      The Contractual Relationship**

In early 2022, Amazon and CUL entered an ocean-freight relationship in which Amazon agreed to purchase CUL's shipping services to transport cargo from China to the United States at specified rates and volumes over a two-year term. Both parties were sophisticated in the industry. CUL's trial witnesses collectively bring more than 130 years of maritime and shipping industry experience to this case: CUL's Chairman and founder Raymond Chen has worked in the maritime and shipping industries throughout his career, spanning more than 35 years and CUL's former co-CEO Lars Christiansen has spent his entire professional career in the maritime industry, beginning at Maersk in 1979, a career of approximately 46 years. (SMF ¶ 27.) Both parties were represented by legal counsel, with CUL's legal team and co-CEOs Raymond Chen and Lars Christiansen evaluating the Contracts. (SMF ¶¶ 25–26, 28.)

After multiple rounds of negotiations between the parties—including exchanging redlines on the terms of termination—in March and April 2022 (SMF ¶ 28), the parties executed three overlapping contracts (collectively, the "Contracts") governing their relationship:

- the Amazon Global Logistics Main Transportation Agreement ("**MTA**"), dated April 7, 2022 (SMF ¶ 3);

- the Nondisclosure Agreement ("**NDA**"), dated March 29, 2022 (SMF ¶ 15), and

- the **Work Order**, dated April 29, 2022 (SMF ¶ 19).

The MTA governs the parties' overall relationship, including termination for cause for unauthorized publicity of Amazon's name or for violations of the NDA. (SMF ¶ 4.) The NDA covers CUL's use of confidential or proprietary information and reiterates that CUL is prohibited from unauthorized public use of Amazon's name. (SMF ¶ 16.) The Work Order details the working terms of CUL's carrier services, including minimum order volume and damages, if any, for early termination without cause. (SMF ¶ 20.) (The plain terms of the Work Order show that the contracts were worth hundreds of millions of dollars to CUL.) In turn, the NDA and Work Order are incorporated into the MTA. (SMF ¶ 10.) The Contracts contain several provisions relevant to this dispute.

**No-publicity.** The parties expressly agreed in two separate provisions that CUL would not advertise or otherwise use Amazon's name or associate itself with Amazon without Amazon's written consent:

- **Section 7(2)** of the MTA (the "Publicity Provision") provides that CUL "will not use Amazon's trade name, trademark, service mark, logo, commercial symbol, or any other proprietary rights without Amazon's prior written consent." (SMF ¶ 5; DX-2 (MTA) § 7(2).)

- **Section 7(1)** of the MTA incorporates the NDA (SMF ¶ 10), and **Section 6** of the NDA prohibits CUL from using "any trade name, trademark, logo or any other proprietary rights of Amazon (or any of its Affiliates) in any manner without prior written authorization of

such use by a Vice President of Amazon (or its applicable Affiliate)." (SMF ¶ 16; DX-1 (NDA) § 6.)

The Contracts provide that Section 7 of the MTA, including CUL's obligations under the NDA, survive termination of the Contracts. (SMF ¶¶ 12, 17; DX-2 (MTA) § 5(5); DX-1 (NDA) § 10.)

**Termination for cause.** The parties further agreed that Amazon had the right to immediately terminate the Contracts without liquidated damages if CUL violated Section 7 of the MTA either through violations of the Publicity Provision or violations of the NDA:

- **Section 5(3)** of the MTA grants Amazon the right to "immediately terminate all or any part of this Agreement or a Work Order upon written notice if [CUL] violate[s] Section 6(1) or Section 7 of these General Terms." (SMF ¶¶ 7–8; DX-2 (MTA) § 5(3).)

- **Schedule 3, Section 5(1)(a)** of the Work Order states CUL is not entitled to liquidated damages where termination is for cause under Section 5(3) of the MTA. (SMF ¶¶ 23–24; DX-3 (Work Order) Sched. 3 § 5(1)(a)); *accord, e.g.*, (SMF ¶ 29 (Chen Dep. 29:15–18 ("Amazon could terminate for cause and would not owe liquidated damages."))).

**Termination for convenience.** Section 5(2) of the MTA provides both parties with the right to terminate for convenience upon at least 90 days' written notice. (SMF ¶ 9; DX-2 (MTA) § 5(2).) In the event of termination for convenience, Schedule 3, Section 5 of the Work Order sets out a formula for liquidated damages but provides that termination for cause does not trigger any liquidated damages. (SMF ¶ 24; DX-2 (MTA) § 5; DX-3 (Work Order) Sched. 3.)

**No oral modifications and integration clauses.** Both the MTA and the NDA provide that the Contracts form the "entire agreement" between the parties. (SMF ¶ 11; DX-2 (MTA) § 13(7)); NDA § 11 ("These terms constitute the entire agreement between the parties relating to the matters

discussed herein."). (SMF ¶ 18; DX-1 (NDA) § 11.) Critically, both agreements independently bar oral modifications: Section 13(7) of the MTA provides that it "may be amended or modified only by a written instrument signed by a duly authorized agent of each party." (SMF ¶ 11; DX-2 (MTA) § 13(7).) The NDA contains a parallel restriction, providing that it "may be amended, modified, or waived only with the mutual written consent of the parties." (SMF ¶ 18; DX-1 (NDA) § 11.)

## II. CUL Repeatedly Violates the No-Publicity Provisions.

Despite the two express no-publicity provisions, CUL repeatedly used Amazon's trade name to market its business and boast about its relationship with Amazon in a campaign that sought to "maximize the endorsement effect of Amazon to the greatest possible extent." (SMF ¶ 53; DX-22.) CUL issued at least eight publications leveraging Amazon's trade name without seeking authorization from—or even notifying—Amazon. (SMF ¶¶ 43, 50.) CUL's marketing strategy included the following publications, all of which occurred without Amazon's prior written consent:

- (1–3) August 9, 2022: CUL issued a WeChat[1] article and website press release announcing the first anniversary of CUL's trans-Pacific service advertising that the route "has had good berthing and delivery record, receiving praise from e-commerce giants such as Amazon[,]" and featured a "Comment from Amazon team" section presenting performance data attributed to the "Amazon Global Logistics Team[,]" (SMF ¶ 45; DX-14; DX-16), and CUL's LinkedIn post on the same date advertised that CUL had received "long-term agreement supports from the U.S. e-commerce giant Amazon" (SMF ¶ 45; DX-15);

- (4) November 22, 2022: CUL issued a WeChat article stating it had received "Amazon's

---

[1] WeChat is an all-encompassing digital ecosystem with over 1 billion users that serves as the primary social media and messaging platform used by companies to advertise in China. https://www.wechat.com/. CUL used its WeChat account to conduct social media marketing campaigns, issue press releases, and post articles. (*See infra*.) CUL also used WeChat as an internal messaging tool for its employees. (*Id.*)

official evaluation" and displaying a "WELCOME AMAZON TEAM" banner (SMF ¶ 46; DX-17), the goal of which, as CUL co-CEO Raymond Chen explained in a contemporaneous WeChat discussion, was to "maximize the endorsement effect of Amazon to the greatest possible extent" (SMF ¶ 53; DX-22);

- (5) December 5, 2022: CUL posted a WeChat promotion showing photos of Amazon Prime shipping containers and again advertising CUL's "stable customer base under long-term contracts, including Amazon" (SMF ¶ 47; DX-18);

- (6) December 8, 2022: CUL made a WeChat announcement identifying Amazon as a "stable and high-quality customer[]" with whom CUL had "signed long-term contracts" (SMF ¶ 48; DX-19.);

- (7–8) March 16, 2023: CUL issued a WeChat post and website article announcing CUL's route had "earn[ed] strong support and widespread praise from key clients and partners including Amazon." (SMF ¶ 49; DX-20; DX-21.)

### III. CUL's Consent Requests and Amazon's Repeated Denials.

Until it discovered otherwise in April 2023, Amazon believed that CUL had been complying with Section 7 of the MTA. On multiple occasions, CUL complied with Section 7 of the MTA by requesting prior written consent from Amazon to publicize Amazon's name. Amazon denied each request. (SMF ¶¶ 30–32, 42.) In response, CUL assured Amazon "[w]e will follow your rules and will not mention Amazon in our public forums" (SMF ¶ 35) and CUL's CEO, Raymond Chen, circulated an internal directive to CUL employees articulating: "[f]or relevant external requirements, we fully respect [Amazon's] opinions and do not issue them" and future potential promotions of CUL's relationship with Amazon "depends on [Amazon's] confirmation, no forcing." (SMF ¶ 36; DX-10.) Mr. Chen further explained that "[w]e understand and respect

[Amazon's] opinions" because "Amazon has signed contracts with many shipping companies" and Amazon has been "very careful about their relationship with other shipping companies." (SMF ¶ 36; DX-10.) In September 2022, CUL again sought Amazon's consent, this time requesting that Amazon participate in a due diligence interview with CUL's pre-IPO financial adviser. (*See* SMF ¶ 39; DX-30.) Amazon provided only limited consent to verify the existence of the business relationship and rough spend figures, while expressly refusing to disclose any contract-related materials or proprietary information, explaining that doing so would be "a violation of multiple policies within Amazon" and "not authorized under our NDA." (SMF ¶ 41; DX-30.)

## IV. Amazon's Termination of the Agreement.

CUL's repeated requests for approval, Amazon's denials, and CUL's assurances that Amazon's requirements would be respected gave Amazon no reason to believe CUL had or would violate Section 7. Before learning of CUL's violations of Section 7, Amazon made the decision to give notice of its intent to terminate the agreement for convenience due in part to changing ocean containerized freight market conditions. (SMF ¶¶ 58–59.) On April 1, 2023, Amazon issued a notice of termination for convenience under Section 5(2) of the MTA, which created a 90-day period ending on June 30, 2023, during which the Contracts would remain in effect. (SMF ¶ 58; DX-25; DX-26.) During this period, Amazon provided CUL with a ramp-down plan and a preliminary liquidated damages calculation to be finalized pursuant to the Work Order. (SMF ¶ 71; DX-29.)

Before the noticed termination for convenience became effective, Amazon employee Jie Liao discovered CUL's unauthorized publications on April 18, 2023, after seeing Amazon's name mentioned on CUL's Chinese language WeChat account. (SMF ¶¶ 60–63; DX-27 (Liao Dep. Tr.) 17:12–15, 18:15–19:14.) Amazon conducted an internal investigation and determined that CUL had repeatedly violated Section 7 of the MTA by using Amazon's trade name in CUL's marketing

publications. (SMF ¶¶ 67–68.) Shortly thereafter, on June 7, 2023, Amazon issued a written notice of termination for cause pursuant to Section 5(3) of the MTA citing CUL's violations of both Section 7(2) and Section 7(1) of the MTA as independent grounds for termination. (SMF ¶ 72; DX-31.) The for-cause termination became effective immediately under the Contracts and superseded the notice of termination for convenience, which was still pending until June 30, 2023. (SMF ¶ 72; DX-31.)

## PROCEDURAL HISTORY

CUL commenced this action on November 24, 2023, and filed the current Second Amended Complaint on March 18, 2024, alleging that Amazon's termination for cause gave rise to two causes of action: one for breach of the express terms of the Contracts (Count II), on the grounds that CUL did not violate Section 7 of the MTA; and one for breach of a newly formed contract arising from negotiations surrounding Amazon's notice of termination for convenience (Count I). The parties completed discovery on February 13, 2026. On February 27, 2026, Amazon filed a pre-motion letter seeking leave to file this motion for summary judgment, which CUL opposed. After a case-management conference on March 10, 2026, the Court entered an order permitting Amazon to move for summary judgment. ECF No. 42.

In its pre-trial brief filed on April 30, 2026, CUL indicated its intent to voluntarily dismiss Count I of the Second Amended Complaint, and the parties have since stipulated to that dismissal. ECF No. 50, Plaintiff's Pretrial Brief n. 7; ECF No. 59. The sole remaining claim is Count II, which alleges that Amazon's termination for cause breached the express provisions of the Contracts.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once that burden is met, the burden shifts to the nonmoving party to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Whether a contract is unambiguous is a question of law for the Court. *See Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 429 (2d Cir. 1992). And where a fully-integrated contract is unambiguous, extrinsic evidence is irrelevant to the contract's interpretation: an unambiguous contract "must be enforced according to the plain meaning of its terms." *In Touch Concepts, Inc. v. Cellco P'ship*, 949 F. Supp. 2d 447, 468 (S.D.N.Y. 2013) (quoting *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002)); *accord W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 163 (1990) (extrinsic evidence cannot create ambiguity).

The Contracts here are fully integrated and expressly and unambiguously permit Amazon to terminate for cause and without liquidated damages based on violations of Section 7(1) or Section 7(2) of the MTA. Because CUL's action arises from Amazon's termination for cause, CUL has the burden of establishing that Amazon was not otherwise "entitled to avail itself of the termination provision." *Jill Stuart (Asia) LLC v. Sanei Int'l Co.*, 548 F. App'x 20, 22 (2d Cir. 2013).

## ARGUMENT

Summary judgment is warranted because there is no genuine factual issue for trial. The Contracts themselves demonstrate that Amazon had the express right to terminate for cause and the undisputed record precludes each of CUL's arguments as a matter of law. First, the Contracts expressly provided Amazon the right to immediately terminate the Contracts without liquidated

damages if CUL violated the Publicity Provision by advertising Amazon's trade name without Amazon's "prior written consent" —and there is no dispute that CUL advertised Amazon's name several times without consent. ***Second***, CUL's only argument that it did not violate the Publicity Provision is a legal one, not a factual one: CUL interprets the Publicity Provision as applying only so long as the parties' relationship remained secret. CUL's interpretation should be addressed— and dismissed—as a matter of law. CUL's interpretation contradicts the Publicity Provision's plain language, conflicts with case law interpreting substantively identical contracts, and violates multiple canons of contract interpretation. ***Third***, CUL's extra-contractual arguments requesting that the Court ignore the Contracts' plain language should be rejected as a matter of law: they are unpleaded and were raised for the first time on the eve of trial, are barred by the terms of the Contracts, and are unsupported by the undisputed record.

## I. Undisputed facts establish that CUL breached the publicity provision and Amazon properly terminated for cause

CUL's publication of Amazon's trade name and the parties' business relationship violated the unambiguous terms of Section 7 of the MTA, granting Amazon the right to immediately terminate CUL for cause without paying liquidated damages.

Section 7(2) of the MTA categorically prohibits CUL from "use" of Amazon's "trade name, trademark, service mark, logo, commercial symbol, or any other proprietary rights without Amazon's prior written consent." Similarly, Section 6 of the NDA, incorporated into Section 7(1) of the MTA, independently prohibits CUL from using any such proprietary rights "in any manner without prior written authorization of such use by a Vice President of Amazon (or its applicable Affiliate)."

As courts within this Circuit, within New York, and across the country have interpreted similar language, the provision is capable of only one reasonable interpretation: any use of

11

Amazon's proprietary rights—including using Amazon's trade name in marketing publications—without Amazon's "prior written consent," violates Section 7 of the MTA. For example, in *JLM Couture, Inc. v. Gutman*, the Second Circuit found that a provision stating that the defendant "shall have no right to the use of [the plaintiff's] Trademarks, [the plaintiff's] Name . . . without the express written consent of [the plaintiff]" was "in no way ambiguous and clearly prohibit[ed]" the defendant from "using" the plaintiff's name. 24 F.4th 785, 796 (2d Cir. 2022); *see also, e.g.*, *Desly Int'l Corp. v. Spartak*, No. 13-cv-2303, 2016 WL 4532113, at *7 (E.D.N.Y. Aug. 29, 2016) (finding "clear and unambiguous" a contract providing that use of "[a]ny and all [of one party's] trademarks and trade names" was "[s]ubject to notice from [that party] in writing"); *New York Skyline, Inc. v. Empire State Bldg. Co. LLC*, No. 651148/2013, 2014 WL 769895, at *2, 6 (Sup. Ct., N.Y. Cnty. Feb. 25, 2014) (contractual provision requiring defendant's "prior written consent" before using defendant's trade name "in any manner" was "susceptible to only one reasonable interpretation, namely, that [the plaintiff] . . . is not permitted to use [the defendant's] protected trade name").

Similarly, the Contracts unambiguously provide that, if CUL violates Section 7 of the MTA, Amazon may terminate the Contracts without owing CUL any liquidated damages. Section 5(3) provides that Amazon may "immediately terminate all or any part of this Agreement or a Work Order upon written notice if [CUL] violate[s] Section 6(1) or Section 7 of these General Terms." There is no dispute that CUL's eight publications leveraging Amazon's name to market CUL's business constituted "use" of Amazon's name. *See JLM Couture*, 24 F.4th at 797 (provision that barred use of plaintiff's name "in trade or commerce" provision covered *any* use in trade or commerce); *see also Sterling Drug Inc. v. Bayer AG*, 792 F. Supp. 1357, 1368 (S.D.N.Y. 1992) (use of plaintiff's name violated agreement notwithstanding its intended target was business

communities rather than customers). Nor is there any dispute that CUL failed to receive written consent from Amazon for its use of Amazon's name. (SMF ¶¶ 42, 50.) As a result, Amazon's termination of the Contracts was proper under the plain language of the MTA, and CUL's claim fails as a matter of law.

**II.     CUL's arguments do not create a material dispute of facts that undermine the contracts' unambiguous language.**

CUL does not dispute—in either its pretrial brief or its opposition to Amazon's request for leave to file this motion—that the plain language of the Contracts granted Amazon the right to terminate the Contracts without paying liquidated damages. Nor does CUL appear to dispute that CUL's eight publications ran afoul of the plain language of both Section 7(2) of the MTA and Section 6 of the NDA as incorporated into Section 7(1) of the MTA. Instead, CUL argues the Court should: **(1) ignore** the unambiguous substantive text of Section 7(2) because Section 7's heading uses the word "Confidentiality," **(2) ignore** the unambiguous substantive text of the NDA because it primarily covers "Confidential Information," and **(3) ultimately ignore** Section 7 altogether because extrinsic evidence purportedly shows that Amazon was barred from terminating for cause. All three arguments fail as a matter of law.

**A.     <u>CUL's argument that the Section 7 heading restricts the Publicity Provision to confidential information fails under settled principles of contract interpretation</u>.**

CUL's sole argument that it did not breach the unambiguous language of Section 7(2) of the MTA (the Publicity Provision), is that the word "Confidentiality" in the heading of Section 7 changes the plain meaning of Section 7(2), and only limits CUL's disclosure of *secret* information. DX-2 (MTA) § 7(2). CUL's argument is inconsistent with fundamental principles of contract interpretation.

*First*, under black-letter New York law, section headings are "for convenience's sake" and do not "affect the construction of" otherwise unambiguous contractual provisions. *Bank of New York Mellon Trust Co., N.A. v. Merrill Lynch Capital Servs., Inc.*, 99 A.D.3d 626, 628 (1st Dep't 2012); *accord, e.g.*, *AB Green Gansevoort, LLC v. Peter Scalamandre & Sons, Inc.*, 102 A.D.3d 425, 427 (1st Dep't 2013) (a section heading "cannot alter . . . the effect of the unambiguous language in the body of the clause itself"). Courts have gone even further in expressly rejecting arguments that similar non-publicity provisions with language broadly limiting the "use" of a party's trade name were ambiguous or in any way qualified by the fact that those provisions appeared under a "confidential" heading or in provisions otherwise applying to confidential information. *See Red Cat Holdings, Inc. v. Autonodyne LLC*, No. 2022-0878-NAC, 2024 WL 342515, at *6 (Del. Ch. Jan. 30, 2024) (publicity clause requiring "prior written consent" before issuing any press release was "unambiguous" and independently breached "irrespective of whether the Press Release disclosed Confidential Information," because it operated as a standalone restriction distinct from the confidentiality provision).

*Second*, CUL's tortured construction impermissibly renders the Publicity Provision (and Section 6 of the NDA)[2] superfluous. Violations of the MTA's Section 7(1) (incorporating the NDA) and Section 7(2) (the Publicity Provision) are independent reasons for Amazon to properly terminate for cause. (SMF ¶¶ 7–8; DX-2 (MTA) § 5(3).) If CUL's construction were accepted, the Publicity Provision (and Section 6 of the NDA) would not prohibit anything that Section 7(1) of the MTA does not already prohibit.

---

[2] CUL's argument that it did not violate the express language Section 6 of the NDA as incorporated in Section 7(1) of the MTA mirrors its arguments that it did not violate Section 7(2) and should be disregarded for the same reasons.

The Second Circuit has squarely rejected a similarly superfluous construction. *JLM Couture*, 24 F.4th at 796 (finding contractual provision that "clearly prohibits" defendant from using plaintiff's name without express written consent "in no way ambiguous" and rejecting defendant's argument that the provision should be limited to the scope of a neighboring provision because it would "render each of these repeated admonitions superfluous."); *accord Contour Design, Inc. v. Chance Mold Steel Co.*, No. 09-cv-451, 2011 WL 6300622, at *20 (D.N.H. Dec. 16, 2011) (rev'd on other grounds) (if a proprietary product clause "accomplished nothing other than preventing [one party] from using [the counterparty's] confidential information[,]" the clause "would be superfluous" given a separate confidentiality provision); *see also Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("Under New York law an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.") (citation omitted). The only reading that gives independent meaning to both provisions is the one Amazon advances: Section 7(2) separately restricts CUL's use of Amazon's proprietary rights in any public communication, regardless of whether the underlying information is confidential.

**Third,** even if headings could modify unambiguous contractual language, the Publicity Provision appears under a distinct, specific subheading titled "Publicity."

> **7  Confidentiality**
>
> (1)  *NDA.* The most recent nondisclosure agreement between (a) Amazon or an affiliate of Amazon and (b) you or your affiliate (the "**NDA**") applies to all Confidential Information provided under this Agreement. The NDA is incorporated by reference into this Agreement. "**Confidential Information**" has the meaning set forth in the NDA. Without Amazon's prior written consent, you will not generate any customer list from this information for marketing or promotional purposes, or target marketing at any shipper or consignee based on this information.
>
> (2)  *Publicity.* You will not use Amazon's trade name, trademark, service mark, logo, commercial symbol, or any other proprietary rights without Amazon's prior written consent.
>
> (3)  *Regulatory contacts.* You will, to the extent permitted by applicable Laws, promptly notify Amazon of (a) any government or regulatory inquiry about Amazon, an affiliate of Amazon, a Third Party Shipper, or any shipment under this Agreement, or (b) any government or regulatory request to hold, transport, or inspect any shipment under this Agreement.

This subheading makes clear that the Publicity Provision imposes a distinct obligation from any general prohibitions on exposing confidential information. *See, e.g.*, *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002) (where "the plain language" of a sub-provision "is global and unqualified," a general heading does not qualify it); *cf. Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46 (1956) ("specific" language trumps "general" language).

***Fourth***, when read in light of all of Section 7's sub-provisions, the MTA's use of the "Confidentiality" heading "merely reflects an attempt to choose a caption that embodies an important theme of the clause rather than serving as an indication that the clause [applies]" only to the extent of the subject matter in the heading. *Int'l Multifoods*, 309 F.3d at 86. Indeed, in addition to inaptly applying the "Confidential" heading as a limitation on Section 7(2), CUL's interpretation also results in an incongruous reading of Section 7(3), which requires CUL to notify Amazon of "[r]egulatory contacts," including government or regulatory inquiries or requests to hold, transport, or inspect shipments. In other words, CUL's interpretation means Section 7(3) would apply only when the government inquiry itself involved "Confidential Information," an "outlandish consequence [that] could not have been the intent of the parties." *See Callahan v. Glob. Eagle Ent. Inc.*, No. 18-CV-8343, 2019 WL 2325903, at *9 (S.D.N.Y. May 30, 2019).

*Fifth*, the Contracts distinguish between "confidential" information and "proprietary rights" (such as Amazon's trade name), demonstrating that the parties knew how to reference confidential information when they meant to, and did not intend Section 7(2) to apply only to confidential information. For example, Section 7(1)'s explicit incorporation of the NDA and statement that "'Confidential Information' has the meaning set forth in the NDA" stands in stark contrast to Section 7(2)'s lack of any reference to confidential information whatsoever. (SMF ¶¶ 5, 10; DX-2 (MTA) §§ 7(1)–(2).) Section 5(5) lists "confidentiality" and "proprietary rights" as separate categories of surviving obligations. (SMF ¶ 12; DX-2 (MTA) § 5(5)) ("*Survival*. The provisions of this Agreement relating to . . . term and termination, . . . **confidentiality**, **proprietary rights**, . . . and general provisions survive termination.") (emphasis added). The parties' choice to distinguish the two types of information cannot be ignored. *See VKK Corp. v. Nat'l Football League,* 244 F.3d 114, 130 (2d Cir. 2001) (applying *expressio unius* to hold that sophisticated commercial parties intentionally excluded categories they did not expressly list); *Mohr-Lercara v. Oxford Health Ins., Inc.*, No. 18-cv-1427, 2022 WL 524059, at \*6–7 (S.D.N.Y. Feb. 22, 2022) (when drafters "knew how to draft" a provision including a specific defined term and "deliberately chose not to do so" in an adjacent provision, the omission "demonstrate[s] a clear intent" not to import that limitation).[3]

---

[3] CUL's assertion that Section 6 of the NDA's title "Ownership of Confidential Information" (incorporated in Section 7(1) of the MTA) supports CUL's proposed interpretation not only fails because a heading cannot alter interpretation of unambiguous contract language and is irrelevant to the interpretation of Section 7(2) of the MTA, CUL's interpretation also ignores the distinction between confidential information and proprietary rights. While CUL may dispute whether the parties' relationship was confidential, there is simply no dispute that Amazon owns the trade name Amazon.

*Finally*, although not necessary to resolve this motion given the Contracts' unambiguous language,[4] CUL's own conduct and admissions independently confirm that CUL understood the Publicity Provision to require Amazon's "prior written consent" for any use of Amazon's trade name (without limitation to confidential information) and that Amazon possessed the right to terminate for cause upon a violation of that requirement.

CUL's own internal communications confirm this understanding. On each occasion CUL wished to use Amazon's name, CUL sought Amazon's written consent, was denied, and acknowledged the denial—yet not once did CUL suggest that the "Confidentiality" heading rendered the consent requirement inapplicable. *See supra* Section III (discussing SMF ¶¶ 30–36, 39–42; DX-4; DX-10.)[5]

B. **CUL's extra-contractual theories fail as a matter of law.**

In its letter opposition to Amazon's request for leave to file this motion, CUL raised for the first time—weeks after the close of fact discovery and months after the deadline for amending pleadings—four new extra-contractual theories: equitable estoppel, breach of the implied covenant

---

[4] Because the MTA is unambiguous, extrinsic evidence is inadmissible. *W.W.W. Assocs., Inc.*, 77 N.Y.2d at 163 ("extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face.").

[5] CUL separately argues that Amazon's reading of Section 7(2) would prevent CUL from carrying out basic shipping operations. That argument is meritless. Amazon had already provided written consent for all operationally necessary uses of its name through the MTA, and the Work Order. The MTA directs CUL to "follow Amazon's written instructions for identifying the shipper, consignor, seller, exporter, consignee, buyer, importer, or similar parties in any shipping, customs, or similar documents." (DX-2 (MTA) § 2(3).) The Work Order further specifies that Amazon's name is to appear on bills of lading, sea waybills, and related shipping documents. (DX-3 (Work Order) § 2(5).) Those instruments collectively constitute the "prior written consent" that Section 7(2) requires for operational disclosures. The eight violations at issue were all promotional publications on social media platforms and website; none involved a bill of lading, customs declaration, or other operational document.

of good faith and fair dealing, waiver, and election of remedies. These theories should be rejected both as untimely and because they are undermined by the undisputed record.

       (1)     CUL's extra-contractual theories are unpleaded and cannot be raised at the summary judgment stage

The sole remaining claim in the SAC is that Amazon's termination for cause breached the express provisions of the Contracts. None of the allegations in the SAC reference the implied covenant of good faith and fair dealing or any of CUL's other extra-contractual theories, whether as independent claims or as a factual basis for any pleaded theory. Nor did CUL ever raise these theories in discovery or in any prior briefing.

Instead, with trial looming and with an undisputed record that forecloses CUL's interpretation of the Contracts—and CUL's action with it—CUL seeks to preserve its action by inserting novel theories predicated on the idea that CUL is entitled to relief regardless of what the Contracts say.  But CUL's theories appear "[n]owhere in the complaint" and are properly treated as a veiled request for "amendment of the complaint to include a claim that [it] did not plead." *Augienello v. Coast-To-Coast Fin. Corp.*, 64 F. App'x 820, 822 (2d Cir. 2003) (rejecting argument that a novel theory was just a "liberal construction" of the complaint); *see also Greenidge v. Allstate Insurance Co.*, 446 F.3d 356, 361 (2d Cir. 2006) (treating plaintiff's attempt to raise novel arguments at summary judgment as an impermissible request for leave to amend). The deadline for amendments, however, has long-since passed on May 25, 2025.[6]

CUL had every opportunity to plead these theories and chose not to do so. The Second Circuit has held that a good-faith-and-fair-dealing argument is "waived" when "mentioned . . . for

---

[6] To date, CUL has never requested leave to amend the SAC and cannot do so through motion papers. *See Soules v. Conn. Dep't of Emergency Servs.*, 882 F.3d 52, 56 (2d Cir. 2018) ("Ordinarily, parties may not amend the pleadings through motions papers"); *Yelle v. Mount Saint Mary Coll.*, No. 21-480-CV, 2022 WL 1715979, at *2 (2d Cir. May 27, 2022).

the first time in [a] memorandum of law in opposition to summary judgment." *Rojo v. Deutsche Bank*, 487 F. App'x 586, 588 (2d Cir. 2012); *accord Greenidge*, 446 F.3d at 361 (affirming rejection of novel arguments raised at summary judgment where the complaint did not "make any reference" to those arguments).

        (2)      Even if properly pleaded, each extra-contractual theory is meritless.

        i.  *CUL's estoppel theory fails as a matter of law.*

CUL's letter opposition and trial brief allege that Amazon was equitably estopped from terminating for cause because Amazon issued an initial notice of termination for convenience. A party invoking equitable estoppel must prove: (1) a misrepresentation or concealment of material facts where there is a duty to disclose; (2) justifiable reliance upon the misrepresentation causing the relying party to change its position to its substantial detriment; (3) the misrepresenting party's intention or expectation of reliance; (4) the misrepresenting party's knowledge of the true facts. *Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 90 (2d Cir. 2013). CUL cannot establish any of these elements.

**Misrepresentation**. Amazon neither made a misrepresentation nor had any duty to disclose its ongoing internal investigation. CUL argues that Amazon misrepresented that the Contracts were terminated for convenience. But the Contracts were never terminated for convenience. Amazon gave *notice* of its intent to terminate for convenience—a prerequisite under the Contract before any such termination can become effective. (SMF ¶ 9; DX-2 (MTA) § 5(2).) The Contracts make clear that any such termination would not be effective until June 30, 2023, and that the Contracts would remain in full effect during the notice period. (SMF ¶¶ 58–59; DX-26.) CUL also points to statements about Amazon's appreciation of CUL's partnership and a cooperative ramp down, but these are non-actionable expressions of goodwill, not "definite misrepresentation[s]" of fact. *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706,

725 (2d Cir. 2001); *see also Nuance Commc'ns, Inc. v. IBM*, 544 F. Supp. 3d 353, 384 (S.D.N.Y. 2021) (holding that "several assurances of performance" did "not rise to the level of fraud, deception, or misrepresentation" required for estoppel) *aff'd*, 2022 WL 17747782 (2d Cir. 2022). Amazon's "failure to disclose" its ongoing investigation also fails as a basis for estoppel. Contracting parties owe no freestanding duty to disclose, much less a duty to disclose how a party intends to perform under a contract. *See Music Royalty Consulting, Inc. v. Reservoir Media Mgmt., Inc.,* No. 18-cv-9480, 2019 WL 1950137, at *7 (S.D.N.Y. Apr. 17, 2019). This is reinforced by Section 5(3), which authorized termination "immediately . . . upon written notice" without prior notice or opportunity to cure. *See Gaia House*, 720 F.3d at 90–91 (reversing estoppel finding because there was no duty to disclose where contract authorized action "without notice or demand").

**Justifiable reliance**. CUL possessed full knowledge of its own conduct and the Contracts' express language—including that it had repeatedly sought and been denied Amazon's consent to publicize—and thus knew or should have known that its unauthorized publications subjected the Contracts to immediate termination under Section 5(3). CUL's own course of dealing confirms as much: CUL repeatedly sought Amazon's consent to publicize, was denied each time, acknowledged those denials internally, and yet published anyway. *See supra* Section III (discussing SMF ¶¶ 30–36, 42; DX-4; DX-10.) A party that possesses full knowledge of its own contractual breaches and of the counterparty's express remedial rights cannot feign ignorance to claim justifiable reliance. *In re Vebeliunas*, 332 F.3d 85, 93–94 (2d Cir. 2003); *see also Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d Cir. 1984) ("Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of

21

justifiable reliance.").

**Intent and Knowledge of Facts**. There is no evidence that any of Amazon's statements were designed to induce CUL's detrimental reliance or that Amazon knew it did not intend to terminate for convenience. Nor could there be. A party with knowledge that it has the right to immediately terminate a contract gains no benefit from concealing that knowledge and voluntarily initiating a process that would cost millions of dollars in liquidated damages.

> ii. *CUL's implied covenant of good faith and fair dealing argument is meritless.*

CUL's letter opposition and trial brief allege that even if the Contracts expressly granted Amazon the right to terminate for cause, Amazon's motivation for exercising that right breached the implied covenant of good faith and fair dealing. But where a contract expressly grants a termination right, the exercise of that right cannot constitute a breach of the implied covenant. JN Contemporary Art LLC v. Phillips Auctioneers LLC, 29 F.4th 118, 128 (2d Cir. 2022) ("[T]here can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged.") (citing 23 Williston on Contracts § 63:22 (4th ed. 2021)).

CUL's assertion that Amazon's financial motivation behind terminating for cause demonstrates bad faith is irrelevant and fails as a matter of law. *E.g.*, *Major Oldsmobile, Inc. v. Gen. Motors Corp.*, 101 F.3d 684, 1996 WL 280452, at *3 (2d Cir. 1996) ("[A]s long as a party has 'the legal right to terminate its obligation under the contract, it is legally irrelevant whether [the party] was also motivated by reasons which would not themselves constitute valid grounds for termination of the contract.'") (quoting *Refinemet Int'l Co. v. Eastbourne N.V.*, 815 F. Supp. 738, 742 (S.D.N.Y. 1993), *aff'd*, 25 F.3d 105 (2d Cir. 1994)); *Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 164 F.3d 619, 1998 WL 667836, at *1 (2d Cir. 1998) (where nonpayment "furnished a good faith reason to terminate for cause . . . any allegations of other improper motives [were]

irrelevant"); *PRCM Advisers LLC v. Two Harbors Inv. Corp.*, No. 20-cv-5649, 2021 WL 2582132, at *10 (S.D.N.Y. June 23, 2021) ("a termination for cause cannot breach the implied covenant, even if motivated by reasons unrelated to cause"); *Suthers v. Amgen Inc.*, 441 F. Supp. 2d 478, 485 (S.D.N.Y. 2006) (no "support for the broad proposition that an entity violates the implied covenant of good faith and fair dealing by acting in its own self-interest consistent with its rights under a contract").

### iii. *CUL's waiver theory fails as a matter of law.*

CUL's letter opposition and trial brief allege that Amazon waived its right to terminate for cause based: (1) Amazon's purported delay issuing a for-cause termination with respect to CUL's unauthorized publications, and (2) CUL's use of Amazon's name in a banner at an in-person event. Waiver "should not be lightly presumed" and must be based on "a clear manifestation of intent" showing that a party "knowingly, voluntarily and intentionally abandoned" a right. *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.,* 7 N.Y.3d 96, 104 (2006); *Coniber v. Ctr. Point Transfer Station, Inc.*, 137 A.D.3d 1604, 1606 (4th Dep't 2016) (waiver "cannot be inferred from mere silence").

**The WeChat Publications**. CUL asserts that Amazon waived its right to issue a for-cause termination because it failed to terminate until June 2023. But a party cannot waive a right it does not know it has the factual basis to exercise. *See Homapour v. Harounian*, 200 A.D.3d 575 (1st Dep't 2021). There is no evidence Amazon knew about CUL's publications before April 18, 2023, when Amazon employee Jie Liao stumbled upon them.[7] (SMF ¶¶ 60–64; DX-27 (Liao Dep. Tr.)

---

[7] Moreover, the two Amazon employees who happened to encounter CUL's posts—Jie Liao and Jesse Wu—were lower-level operations personnel with no knowledge of the MTA's terms. Liao testified that he had no "visibility to contracts" and did not know whether CUL's use of Amazon's name violated any contractual provision. Liao Tr. 19:22–24. Wu similarly testified that monitoring CUL's social media was not part of his job responsibilities. Wu Tr. 18:20–25; 20:10–12. Neither

17:12–15, 18:15–19:14.) Amazon issued its for-cause notice less than two months later, a timeline inconsistent with knowing relinquishment and consistent with prompt enforcement following a reasonable investigation. (SMF ¶ 69.) *See PRCM Advisers*, 2021 WL 2582132, at \*5 (where defendant initially informed plaintiff of non-renewal, then terminated for cause, the court was "not persuaded that a four month delay before terminating for cause was unreasonable as a matter of law.").

**The TraPac Banner**. CUL separately contends that Amazon's failure to object to a "WELCOME AMAZON TEAM" banner displayed at a TraPac terminal visit on October 24, 2022 constituted waiver of the Publicity Provision. This argument fails as a matter of law for multiple independent reasons.

First, Amazon did not create or authorize the banner, nor was it given advance notice that CUL intended to display it. (SMF ¶ 57.) Amazon's mere failure to object to a banner it encountered for the first time at an in-person event falls far short of the "clear manifestation of intent" required to establish that Amazon "knowingly, voluntarily, and intentionally abandoned" its contractual right. *Fundamental Portfolio Advisors*, 7 N.Y.3d at 104.

Second, Section 13(7) of the MTA provides that the MTA "may be amended or modified only by a written instrument signed by a duly authorized agent of each party." (SMF ¶ 11; DX-2 (MTA) § 13(7).) This written-modification requirement independently bars waiver: See PRCM Advisers, 2021 WL 2582132, at \*5 (enforcing materially identical clause under N.Y. Gen. Oblig. Law § 15-301(1)).

Third, and critically, even if Amazon's response to the banner could be characterized as

---

employee had any basis to recognize or report a contractual violation when they first encountered the posts.

waiver, any such waiver would apply only to that specific incident—it would not function as a blanket prospective waiver of Amazon's future right to enforce the Publicity Provision. *See Kavanaugh v. Kavanaugh*, 200 A.D.3d 1568, 1574–75 (4th Dep't 2021). The WeChat, LinkedIn, and website publications that formed the basis of the for-cause termination were legally distinct events made on different dates, on different platforms, to different audiences, and for different commercial purposes.

### iv. *CUL's election of remedies theory also fails.*

CUL's letter opposition and trial brief contend that Amazon "elected" not to terminate for cause because Amazon continued performing for approximately eight months after the October 2022 TraPac terminal visit. CUL's contention fails because the election of remedies doctrine is breach-specific: a party that elects to continue performance as to one breach "retains the option of terminating the contract based on other, subsequent breaches." *ESPN, Inc. v. Off. of Comm'r of Baseball*, 76 F. Supp. 2d 383, 387–88 (S.D.N.Y. 1999); *see also PRCM Advisers*, 2021 WL 2582132, at *7. The election-of-remedies doctrine also requires action "with full knowledge of all the facts." *Am. Woolen Co. of N.Y. v. Samuelsohn*, 226 N.Y. 61, 66 (1919). Amazon had no knowledge of CUL's breaching publications until April 18, 2023, and issued its for-cause notice less than two months later. Any continued performance prior to that date cannot constitute a binding election as to breaches Amazon did not yet know existed.

### CONCLUSION

For the foregoing reasons, Defendant Amazon.com Services LLC respectfully requests that this Court grant summary judgment in Amazon's favor dismissing CUL's Second Cause of Action with prejudice; and grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: May 20, 2026

K&L GATES LLP

By: /s/ Benjamin I. Rubinstein

Benjamin I. Rubinstein
599 Lexington Avenue
New York, NY 10022
(212) 536-3900
benjamin.rubinstein@klgates.com

Jeffrey C. Johnson (admitted pro hac vice)
Abraham M. Weill (admitted pro hac vice)
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
(206) 623-7580
jeff.johnson@klgates.com
abe.weill@klgates.com

*Attorneys for Defendant*
*AMAZON.COM SERVICES LLC*