UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
CHINA UNITED LINES, LTD,

Plaintiff,

-against-

AMAZON SERVICES LLC,

Defendant.
-----------------------------------------------------------x

23-cv-10313 (PKC)

OPINION AND ORDER
FINDINGS OF FACT AND
CONCLUSIONS OF LAW

CASTEL, U.S.D.J.,

Plaintiff China United Lines, Ltd. ("CUL") brings a claim for breach of contract against Amazon Services LLC ("Amazon"), asserting that Amazon breached a work order (the "Work Order") pursuant to which CUL provided trans-Pacific shipping services to Amazon. Amazon sent CUL a notice of termination for convenience that would become effective once 90 days elapsed. While the 90-day period was pending, Amazon sent CUL a notice of termination for cause, effective immediately, stating that CUL had violated the parties' Main Transportation Agreement (the "MTA") by using the Amazon trade name for publicity purposes without obtaining Amazon's prior written consent. CUL asserts that the termination for cause was not permitted by the parties' Main Transportation Agreement (the "MTA") and seeks $32.136 million in liquidated damages arising out of the termination for convenience.

CUL's claim proceeded to trial to the Court. At trial, CUL did not dispute that it used the Amazon trade name to publicize the parties' business relationship without first obtaining Amazon's written consent, as required by the MTA. The Court concludes that Amazon had the contractual right to terminate the Work Order and MTA for cause. Because the

termination for cause was consistent with the parties' agreements and superseded the notice of termination for convenience, the Court concludes that Amazon did not breach the Work Order. The Court will direct the Clerk of Court to enter judgment for Amazon.

These are the Court's Findings of Fact and Conclusions of Law. Rule 52(a)(1), Fed. R. Civ. P.

FINDINGS OF FACT

1. CUL is in the business of providing transoceanic shipping services out of ports in mainland China. (Stip. Facts ¶ 2; Chen Dec. ¶ 8 (PX-KKK).)[1]

2. Amazon uses many different ocean carriers. (Stip. Facts ¶ 5.) In early 2022, CUL and Amazon began to negotiate an agreement for the shipment of goods from China to the United States. (Stip. Facts ¶¶ 4-5; Chen Dec. ¶ 14.)

3. Amazon uses a "standard contracting regime" that consists of a non-disclosure agreement (the "NDA"), the MTA and the Work Order. (Stip. Facts ¶ 9.)

4. The NDA governs the use of Amazon's confidential and proprietary information. (PX-A (ECF 58-1).) CUL signed the NDA on March 29, 2022. (Stip. Facts ¶ 11.)

5. The MTA is the master agreement between the parties. (Stip. Facts ¶ 12; DX-2 (ECF 82-3).) CUL signed the MTA on April 7, 2022. (Stip. Facts ¶ 13.)

6. The Work Order governed the period from May 1, 2022 to April 30, 2024. (Stip. Facts ¶ 14; PX-C (ECF 58-3).) CUL signed the Work Order on April 29, 2022. (Stip. Facts ¶ 14.)

[1] The parties' stipulation of facts was filed at Exhibit A to the Joint Pre-Trial Order ("JPTO"). (ECF 83-1.) Throughout, the citation to evidence is exemplary and is not intended to convey that the cited evidence is the only supporting evidence in the record.

7. Counsel for CUL and Amazon reviewed the NDA, MTA and Work Order prior to execution. (Stip. Facts ¶¶ 15-16.)

8. CUL scrutinized the agreements and obtained certain concessions from Amazon. Specifically, it negotiated a significant increase in the Tender Shortfall Liquidated Damages provision at schedule 3, section 5 of the Work Order. (Stip. Facts ¶ 17; Trial Tr. 45-46; PX-C.) Initially, in the event that Amazon's shipping volume did not reach thresholds designated by the parties, Amazon requested that it be liable for $50 per forty-foot container equivalent ("FEU"). (Stip. Facts ¶ 17.) After negotiation, the parties agreed that Amazon would pay $2,000 per FEU and added a provision requiring $1,000 per FEU in the event that Amazon exercised early-termination rights. (Stip. Facts ¶ 17.)

9. CUL did not propose any amendments to the MTA, explaining that it viewed the MTA as a "fixed version" that could not be amended. (Trial Tr. 49-50.)

10. The Court finds that CUL and Amazon are sophisticated and well-resourced parties that were represented by counsel throughout the review and negotiation of the NDA, the MTA and Work Order, and that CUL knowingly, voluntarily and intelligently entered into them.

11. Not long after the parties executed the Work Order, representatives of CUL and Amazon discussed the industry-wide price drop in trans-Pacific shipping rates. (Stip. Facts ¶ 24.) CUL agreed to Amazon's request for lower rates and the parties entered into an Amendment to the Work Order. (Stip. Facts ¶¶ 24-25; PX-T (ECF 55-8).)

12. In February 2023, Amazon asked CUL to consider a reduction to the minimum-quantity requirement, or, alternatively, a lower per-container shipping price, through a formal review of the proposals. (Stip. Facts ¶ 27.)

13. The MTA permitted Amazon to terminate the agreement for convenience with a sizeable payment of liquidated damages. Section 5(2) of the MTA states in relevant part: "*Termination for convenience*. Either party may terminate this Agreement or a Work Order for convenience by providing at least 90 days' written notice." (DX-2.) Schedule 3, section 5(4)(c) of the Work Order sets forth a method of calculating liquidated damages in the event that Amazon terminates the Work Order for convenience. (PX-C.)

14. During a call of March 20, 2023, Amazon told CUL that it would exercise its right under the MTA to terminate for convenience and verbally acknowledged that it owed CUL liquidated damages pursuant to the Work Order. (Stip. Facts ¶ 28.) During the call, Amazon referred to a "90-day ramp down period" and asked CUL to reduce the sum owed in liquidated damages. (Stip. Facts ¶ 28.) Amazon has acknowledged that its termination for convenience was motivated by the change in market conditions for shipping costs. (Cardadeiro Dec. ¶ 26 (DX-35).)

15. Amazon then sent CUL a written notice of termination for convenience dated April 1, 2023, citing section 5(2) of the MTA and section 1(1)(b) of the Work Order. (Stip. Facts ¶ 29; PX-Z (ECF 58-13).) The notice stated that "Amazon hereby notifies CU Lines of its election to terminate the WO, effective as of May 30, 2023, 90 days following the date of this notice." (PX-Z.) The email from Amazon that attached the notice stated, "Once the 90-day termination period has concluded, we will reconvene to reconcile what is owed for termination based off actuals and commitment balance." (Id.)

16. The MTA requires a 90-day notice period before a termination for convenience goes into effect. (Stip. Facts ¶ 30; MTA § 5(2).) The Court finds that the reference

to May 30, 2023 contained in the written notice of termination was in error, and that the 90-day notice period running from April 1, 2023 concluded on June 30, 2023.

17. On April 26, 2023, Connor Klosky of Amazon sent CUL a preliminary calculation of the liquidated damages that Amazon would owe for its termination for convenience. (PX-AA (ECF 58-14); Liu Dec. ¶ 65 (PX-LLL).) It calculated a total payment of $31.56 million, consisting of $5.76 million in Tender Shortfall Liquidated Damages and $25.8 million in Early Termination Tender Shortfall Liquidated Damages. (PX-AA; Liu Dec. ¶ 65.) CUL did not agree to a lower figure. (Stip. Facts ¶ 33.)

18. Separately, the MTA has a provision that governs for-cause termination of the MTA or the Work Order. Section 5(3) of the MTA states:

> *Termination for cause*. Either party may terminate this Agreement or a Work Order for material breach by providing at least 30 days' written notice if the other party fails to cure the breach within 30 days of receiving notice of the breach. Amazon may immediately terminate all or any part of this Agreement or a Work Order upon written notice if you violate Section 6(1) or Section 7 of these General Terms.

(DX-2.)

19. Section 7 of the MTA has the boldfaced heading "**Confidentiality.**" (DX-2.)

20. Section 7(2) of the MTA states in full: "*Publicity.* You will not use Amazon's trade name, trademark, service mark, logo, commercial symbol, or any other proprietary rights without Amazon's prior written consent." (DX-2.)

21. Section 7(1) of the MTA incorporates the NDA by reference. (DX-2.)

22. Section 6 of the NDA states in full:

> **Ownership of Confidential Information.** All Confidential Information will remain the exclusive property of Amazon.

> Amazon's disclosure of Confidential Information will not constitute an express or implied grant to you of any rights to you or under Amazon's patents, copyrights, trade secrets, trademarks or other intellectual property rights. You will not use any trade name, trademark, logo or any other proprietary rights of Amazon (or any of its Affiliates) in any manner without prior written authorization of such use by a Vice President of Amazon (or its applicable Affiliate).

(PX-A.) Section 1 of the NDA defines "Confidential Information" as "any nonpublic information relating to Amazon that is designated as confidential or that, given the nature of the information or the circumstances surrounding its disclosure, reasonably should be considered as confidential." (PX-A.)

23. On at least two occasions in 2022, Amazon denied requests by CUL to use the Amazon name in association with publicity. (Cardadeiro Dec. ¶¶ 20-22; PX-OO (ECF 50-46); DX-11 (ECF 66-11).)

A. On April 19, 2022, CUL emailed Becky Moore and Connor Klosky of Amazon "to seek your approval" to use Amazon's name in a news release or ceremony about CUL's work for Amazon. (PX-OO at 11.) Klosky replied on April 26, 2022, stating, "Unfortunately we won't be able to do any type of public press release / ceremony where Amazon is mentioned. Please note, this is not China United specific as we do not do this with any of our suppliers. Amazon prefers to keep a tight lid on who we do business with in public forums." (PX-OO at 10.) CUL replied, "We will follow your rules and will not mention Amazon in our public forums . . . ." (PX-OO at 9.) In a subsequent internal email that reflected upon Amazon's denial of permission, Honghui Chen, the CEO of CUL, observed that Amazon is "very careful" about its relationships with shipping companies and stated that any use of the Amazon name by CUL "depends on their confirmation, no forcing." (PX-OO at 2.)

B. In an email to Moore and Klosky of July 22, 2022, CUL stated that it was in the process of preparing an initial public offering, and requested Amazon's consent to reference in its prospectus a "newly-entered long-term agreement with Amazon since May 2022." (DX-11 at 4-5.) Klosky replied that "[i]f no legal requirement exists, Amazon needs to remain anonymous, listed only as a 'strategic customer'." (DX-11 at 2.) An internal CUL email reported that "Amazon does not wish to have its name included in the prospectus." (DX-11 at 1.)

24. The Court finds that CUL employees and executives, including CEO Chen, were knowledgeable about and conscious of the MTA's requirement that CUL not publicize its business relationship with Amazon without obtaining Amazon's prior written consent.

25. On June 7, 2023, before expiration of the 90-day notice period commenced by the notice of termination for convenience, Amazon sent CUL a notice of termination for cause, asserting that CUL had publicized the Amazon trade name in violation NDA and the MTA. (Stip. Facts ¶ 35; PX-D (ECF 58-4).) The letter was signed by David Cardadeiro, Director of Global Transportation Procurement and Customs at Amazon. (PX-D at 3.) While Amazon's decision to invoke the "for cause" termination provision was undoubtedly motivated to some degree by a desire to avoid paying more than $31 million in liquidated damages, the termination "for cause" stands or falls on its own merits.

26. Amazon's letter of June 7, 2023 stated in part:

> Pursuant to Section 5(3) of the [MTA] and Section 1(5) of the [Work Order], Amazon hereby terminates the [Work Order] for cause due to CU Lines' violation of Section 7 of the [MTA]. This termination for cause supersedes Amazon's prior notice of termination for convenience, dated April 1, 2023. This termination for cause is effective immediately.

> CU Lines violated Section 7(2) of the [MTA] by using Amazon's trade name, trademark, service mark, logo, commercial symbol, or any other proprietary rights without Amazon's prior written consent. CU Lines' unauthorized use and disclosure of Confidential Information relating to the commercial relationship between Amazon and CU Lines, and its failure to notify Amazon of the unauthorized used and disclosure of such Confidential Information, also violates Section 7(1) of the [MTA] and Sections 3, 6 and 7 of the NDA.

(PX-D at 1-2.)

27. The letter of June 7, 2023 cited three instances in which CUL publicized the Amazon trade name without obtaining Amazon's consent. (PX-D at 2-3.) Those statements were posted in the Mandarin language to WeChat, a popular social-media platform in China. The letter identified the following uses of the Amazon trade name by CUL:

A. CUL posted to WeChat: "Since TPC service was updated to version 2.0 in May 2022, it has achieved good performance in vessel schedule, delivery and service results, and has received strong support and good reputation from Amazon and other customers and partners." (PX-D at 3.)

B. CUL described on WeChat its work shipping cargo to the United States, stating in part that CUL "received long-term contract support from the American e-commerce giant Amazon, On May 27th, the maiden voyage ship held a welcome ceremony at TraPac Wharf." (PX-D at 3.)

C. CUL described the speed and efficiency of its services, stating that the company "has a good berthing and delivery record, and has been well received by e commerce giants such as Amazon and Lianyu." (PX-D at 3.)

28. On April 18, 2023, Amazon first identified CUL's WeChat posts mentioning Amazon. (Cardadeiro Dec. ¶ 27.) In consultation with legal counsel, Amazon then

investigated CUL's public references to Amazon. (Cardadeiro Dec. ¶ 29.) The investigation lasted six to seven weeks. (Cardadeiro Dec. ¶ 29.)

29. CUL does not dispute that it used Amazon's trade name in the three instances identified in the June 7, 2023 letter without obtaining Amazon's prior written consent. Chen, the CEO of CUL, approved the use of Amazon's name in posts that described the two parties' business relationship. (Chen Dec. ¶ 44; Trial Tr. 94.)

30. At trial, CUL emphasized that it publicized its relationship with Amazon only after learning that Amazon itself had publicized the relationship. On July 4, 2022, Amazon posted on WeChat about its business relationship with CUL, stating that CUL provided route capacity to ship sea freight "from Yantian to American West." (PX-E (ECF 50-5).) The WeChat post by Amazon also touted the frequency and timeliness of CUL's shipments. (PX-E.)

31. Yew Ping Teo, the Chief Trade Officer at CUL, testified that after Amazon's post of July 4, 2022, "the relationship between the parties was very public because Amazon wanted it to be public." (Teo Dec. ¶ 24 (ECF 50-70).) Chen, the CEO of CUL, also testified that he was "pleased" by the Amazon post "because it showed that the relationship was no longer confidential." (Chen Dec. ¶ 40.)

32. Chen testified that after Amazon's post of July 4, 2022, CUL believed that it could publicize its relationship with Amazon. (Trial Tr. 110 ("Everything comes out because of on July 4th, Amazon initiated a post on its official WeChat account, WeChat platform.").) While the Court need not consider any party's subjective understanding of the unambiguous agreements, Chen's testimony is contradicted by CUL's written request of July 22, 2022 to use Amazon's name in connection with CUL's IPO and prospectus. (DX-11.)

## CONCLUSIONS OF LAW

33. The JPTO lists the claims and defenses to be tried. (JPTO at 2-4.) The Court quotes the entirety of the description of CUL's claim to be tried:

> CUL asserts a claim for breach of contract against Amazon. The Work Order entered by the parties calls for the payment of liquidated damages by Amazon to CUL in the event that Amazon prematurely terminates the Work Order for convenience. Amazon terminated the Work Order for convenience, and then never paid liquidated damages to CUL. As such, CUL's sole claim at trial is for $32.136 million in liquidated damages against Amazon, plus pre-judgment and post-judgment interest, for Amazon's breach of the Work Order. Amazon has no valid excuse for refusing to pay its contractual obligations.

(JPTO at 2-3.)

34. Amazon's defenses include the following: "Amazon did not breach the contracts and does not owe any liquidated damages because it was expressly authorized to terminate the contracts without the damages CUL now seeks if CUL publicized Amazon's name without prior written consent. Amazon did not terminate the contracts for convenience, Amazon gave notice of intent to terminate for convenience, which required a 90-day notice period before becoming effective. Amazon terminated for cause before the termination for convenience became effective." (JPTO at 3.) Amazon waived seven affirmative defenses. (Id. at 3-4.)

35. The Second Amended Complaint originally brought two breach of contract claims. (ECF 19.) Count One asserted that the parties formed an agreement on or about May 10, 2023 to terminate the Work Order and MTA in exchange for Amazon's payment of liquidated damages. (2d Am. Compl't ¶¶ 36-41.) Count Two was pleaded in the alternative and asserted that Amazon wrongly terminated the Work Order and MTA for cause. (2d Am. Compl't ¶¶ 42-45.) After the close of fact discovery but approximately fifteen days before the

parties filed the proposed JPTO, the parties filed a stipulation of voluntary dismissal as to Count One, which the Court entered as an Order. (ECF 67.)

36. The JPTO's description of the claim to be tried bears little resemblance to Count Two, nor does it overlap with the dismissed Count One, which alleged the formation of a new contract in May 2023. Amazon participated in the preparation of the JPTO, filed it to the docket, and presumably was aware of CUL's description of its claim. At times, however, Amazon argues against a finding of liability as to Count Two. (See, e.g., ECF 102 at 17 ("Amazon's defense to CUL's only live claim (Count II) does not depend on condition precedent.").) For its part, CUL's post-trial arguments stray beyond the description of its claim in the JPTO and suggest new theories of liability and damages.

37. These Findings of Fact and Conclusions of Law are guided by the claims and defenses set forth in the JPTO. At trial, the Court twice directed the parties' attention to the JPTO's description of CUL's claim. (Trial Tr. 12-13, 69.) "Obviously, the very purpose of the Joint Pretrial Order is to insure that all of the issues that will be raised at trial have been made known to the court and to the opposing party . . . ." Fonar Corp. v. Magnetic Plus, Inc., 175 F.R.D. 53, 56 (S.D.N.Y. 1997) (Motley, J.). "The court may modify the order issued after a final pretrial conference only to prevent manifest injustice." Rule 16(e), Fed. R. Civ. P. No party has moved to modify the JPTO.

38. Section 13(2) of the MTA provides that New York law governs the agreement. (DX-2.) The Work Order and the NDA do not have a choice-of-law provision. Neither party disputes that New York law governs CUL's claim.

39. "The elements of a cause of action for breach of contract are the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and

resulting damages." Noto v. Planck, LLC, 228 A.D.3d 516, 516 (1st Dep't 2024) (quotation marks omitted). CUL has the burden to prove these elements by a preponderance of the evidence. See, e.g., RJR Mech., Inc. v. Liberty Mut. Ins. Co., 618 Fed. App'x 29, 30 (2d Cir. 2015) (summary order).

40. The Court concludes that CUL has not proved that Amazon breached the Work Order because the evidence showed that Amazon's written notice of termination for convenience never became effective. As discussed, the MTA or Work Order could be terminated for convenience only "by providing at least 90 days' written notice." (MTA § 5(2).) Amazon's notice of termination for convenience was dated April 1, 2023. (Stip. Facts ¶ 29; PX-Z.) Its notice of termination for cause was dated June 7, 2023, before the 90-day notice period elapsed. (Stip. Facts ¶ 35; PX-D.) It stated that "[t]his termination for cause supersedes Amazon's prior notice of termination for convenience, dated April 1, 2023." (PX-D.) At the Final Pretrial Conference, CUL agreed that Amazon withdrew the notice of termination for convenience. (6/9/26 Tr. at 9.) CUL's breach of contract claim is premised on liquidated damages owed for the Work Order's termination for convenience. (JPTO at 2-3.) Because termination for convenience never became effective and was superseded by the notice of termination for cause, the Court concludes that CUL did not prove that Amazon breached the Work Order by not paying liquidated damages to CUL.

41. CUL's post-trial submissions include an alternative claim for breach of contract and damages. CUL argues that "[e]ven if no valid termination for convenience was ever completed by Amazon, the Work Order calls for the payment of Tender Shortfall Liquidated Damages." (ECF 98 at 7.) But any failure to pay Tender Shortfall Liquidated Damages apart

from the damages sought on the termination for convenience is not part of the "sole claim" described in the JPTO. (JPTO at 2-3.)

42. Even if the Court were to consider the newly-proposed claim, the Work Order required CUL to "request payment of the Tender Shortfall Liquidated Damages in writing within 30 days following the last day of the Term or waive its right to receive the Tender Shortfall Liquidated Damages or pursue any other damages . . . ." (Work Order Schedule 3 § 5(1)(c).) CUL does not contend that it made such a written request.

43. The Court separately concludes that the record establishes that Amazon had the right to terminate the Work Order for cause under sections 5(3) and 7(2) of the MTA based upon CUL's use of the Amazon trade name in publicity. Because Amazon's termination for cause was consistent with the MTA, CUL has not proved by the preponderance of the evidence that Amazon breached the Work Order.

44. When a plaintiff challenges the for-cause termination of a contract, it must "tender[ ] sufficient evidence to demonstrate that the defendant improperly terminated the agreement 'for cause.'" Malloy v. Reliable Power Alternatives Corp., 224 A.D.3d 675, 677 (2d Dep't 2024); see also PRCM Advisers LLC v. Two Harbors Inv. Corp., 2021 WL 2582132, at *6 (S.D.N.Y. June 23, 2021) ("[Defendant] had a contractual right to terminate for cause if [plaintiff] materially breached the agreement or acted with gross negligence. To state a claim for breach of contract, [plaintiff] must allege that the purported events did not occur or were not material breaches or acts of gross negligence.") (Kaplan, J.). CUL asserts "Amazon has no valid excuse for refusing to pay its contractual obligations." (JPTO at 3.) It does not urge that Amazon has the burden to prove that it properly terminated the Work Order for cause.

45. If, in the alternative, Amazon has the burden to prove the defense that "it was expressly authorized to terminate the contracts" because "CUL publicized Amazon's name without prior written consent" (JPTO at 3), the Court concludes that Amazon met that burden.

46. "As long as a party has the legal right to terminate its obligation under the contract, it is legally irrelevant whether the party was also motivated by reasons which would not themselves constitute valid grounds for termination of the contract." Major Oldsmobile, Inc. v. Gen. Motors Corp., 101 F.3d 684 (2d Cir. 1996) (summary order) (quotation marks and brackets omitted); accord PRCM Advisers, 2021 WL 2582132, at *6.

47. "Where the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole." Ellington v. EMI Music, Inc., 24 N.Y.3d 239, 244 (2014); accord Beal Savings Bank v. Sommer, 8 N.Y.3d 318, 324 (2007) ("Construction of an unambiguous contract is a matter of law, and the intention of the parties may be gathered from the four corners of the instrument and should be enforced according to its terms."); Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569 (2002) ("The best evidence of what parties to a written agreement intend is what they say in their writing.").

48. "'[C]ourts may not by construction add or excise terms, nor distort the meanings of those used and thereby make a new contract for the parties under the guise of interpreting the writing.'" ACE Sec. Corp. v. DB Structured Products, Inc., 25 N.Y.3d 581, 597 (2015) (quoting Vermont Teddy Bear Co. v. 538 Madison Realty Co., 1 N.Y.3d 470, 475 (2004)). "Courts will give effect to the contract's language and the parties must live with the consequences of their agreement. If they are dissatisfied, the time to say so is at the bargaining table." Eujoy Realty Corp. v. Van Wagner Commc'ns, LLC, 22 N.Y.3d 413, 424 (2013)

(quotation marks and alterations omitted). "The words and phrases used by the parties must, as in all cases involving contract interpretation, be given their plain meaning." Ellington, 24 N.Y.3d at 244 (quotation marks omitted); accord Greenfield, 98 N.Y.2d at 569 ("[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.").

49. "A reading of the contract should not render any portion meaningless. Further, a contract should be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose." Beal Savings Bank, 8 N.Y.3d at 324-25 (quotation marks and citations omitted); see also South Rd. Assocs., LLC v. Int'l Bus. Machines Corp., 4 N.Y.3d 272, 277 (2005) (it is "important to read the document as a whole to ensure that excessive emphasis is not placed upon particular words or phrases.").

50. A court may consider extrinsic evidence of the parties' intent only if it concludes that the contract is ambiguous. Greenfield, 98 N.Y.2d at 569. "'[A] contract is not rendered ambiguous just because one of the parties attaches a different, subjective meaning to one of its terms.'" Bank of New York Mellon v. WMC Mortgage, LLC, 136 A.D.3d 1, 9 (1st Dep't 2015) (quoting Bajraktari Mgt. Corp. v. American Int'l Grp., Inc., 81 A.D.3d 432, 432 (1st Dep't 2011)); accord Johnson v. Lebanese Am. Univ., 84 A.D.3d 427, 435 (1st Dep't 2011) ("[T]hat one party to an agreement may attach a particular, subjective meaning to a term that differs from the term's plain meaning does not render the agreement ambiguous."). "It is well settled that extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." W.W.W. Associates, Inc. v. Giancontieri, 77 N.Y.2d 157, 163 (1990) (quotation marks omitted).

51. There is no suggestion that the doctrine of contra preferentem, which is "a matter of last resort," applies to these commercial agreements negotiated at arm's length between sophisticated parties. See, e.g., W. & S. Life Ins. Co. v. U.S. Bank Nat'l Ass'n, 209 A.D.3d 6, 14 (1st Dep't 2022); Pac. Life Ins. Co. v. US Bank Nat'l Ass'n, 636 F. Supp. 3d 366, 415 n. 41 (S.D.N.Y. 2022) (Gardephe, J.) (collecting cases).

52. The Court concludes that the relevant provisions of the NDA, the MTA and the Work Order are unambiguous, specifically as to section 6 of the NDA, which governs CUL's use of the Amazon trade name; sections 5(3) and 7 of the MTA, which respectively govern termination for cause and the use of Amazon's trade name; and section 1(5) of the Work Order, which governs early termination.

53. The parties have agreed that section 7(2) of the MTA and section 6 of the NDA are unambiguous. (See 6/9/26 Tr. at 5.) At moments, however, CUL also has argued that section 7 of the MTA is ambiguous. (6/9/26 Tr. at 18, 19 ("We're not conceding that this is an unambiguous provision."); Trial Tr. at 6-7 (arguing that the words "publicity" and "confidentiality" are ambiguous).)

54. CUL has failed to identify an ambiguity. It argues that "we have two parties here who look at a provision and come away with two very different conclusions." (6/9/26 Tr. at 18.) As discussed, a dispute on the meaning of a contract's express terms does not render those terms ambiguous. Bank of New York Mellon, 136 A.D.3d at 9. The Court concludes that section 7(2) of the MTA and section 6 of the NDA are unambiguous. See, e.g., JLM Couture, Inc. v. Gutman, 24 F.4th 785, 796 (2d Cir. 2022) (concluding that similar provision limiting plaintiff's use of naming rights in publicity was unambiguous).

55. "Captions are relevant to contract interpretation." Int'l Multifoods Corp. v. Com. Union Ins. Co., 309 F.3d 76, 85 (2d Cir. 2002) (applying New York law); see also Ward v. TheLadders.com, Inc., 3 F. Supp. 3d 151, 162 (S.D.N.Y. 2014) ("the heading must be considered and given effect in contractual construction.") (Koeltl, J.); Day v. SLIC Network Sols., Inc., 87 Misc. 3d 1239(A), at *4-5 (N.Y. Sup. Ct. Essex Cnty. 2025) ("It is reasonable to rely on headings in interpreting a contract in the absence of a provision in the contract indicating that headings are not to be used to affect the contract's meaning.").

56. But "a heading cannot alter the effect of the unambiguous language in the body of the clause itself." AB Green Gansevoort, LLC v. Peter Scalamandre & Sons, Inc., 102 A.D.3d 425, 427 (1st Dep't 2013) (quotation marks and ellipsis omitted). Captions or headings are not viewed in isolation. In re Bank of New York Mellon Corp. Forex Transactions Litig., 42 F. Supp. 3d 520, 526 n. 18 (S.D.N.Y. 2014) (observing that plaintiffs "do not suggest any reason that the contract's headings rather than its substance should control the Court's interpretation.") (Kaplan, J.). A heading may "merely reflect[ ] an attempt to choose a caption that embodies an important theme of the clause rather than serving as an indication that the clause excludes" a particular subject. Int'l Multifoods, 309 F.3d at 86.

57. CUL argues that because section 7 of the MTA has the heading "**Confidentiality**", which is in bolded typeface, the substantive provisions of section 7 exclusively govern the parties' confidentiality obligations. (See DX-2.) In CUL's interpretation, once Amazon publicized the parties' relationship in its July 4, 2022 WeChat post, the relationship ceased to be confidential and CUL could reference Amazon without first obtaining Amazon's written consent. But the express terms of section 7(2) of the MTA cannot be fairly read as exclusively limited to confidential matters. Section 7(2) has the italicized subheading

"*Publicity*" and states that "[y]ou will not use Amazon's trade name, trademark, service mark, logo, commercial symbol, or any other proprietary rights without Amazon's prior written consent." (DX-2.) There is no confidentiality protection in a company's trade name, trademark, service mark, logo or commercial symbol. These are widely known brand identifiers openly used in commerce to identify a business and distinguish it to consumers. Registered trademarks are publicly filed with the United States Patent and Trademark Office. At the same time, Amazon has a business interest in limiting the use of its name in the promotional activities of its shippers and other contractors, both from concern of potential brand dilution and managing its relationships among different contractors. CUL CEO Chen seemed to recognize as much in his internal email stating that "Amazon has signed contracts with many shipping companies, and we are not the only one. They are also very careful about their relationship with other shipping companies." (PX-OO at 2.) CUL strains the express terms of section 7(2) by arguing that the "**Confidentiality**" heading limits the provision's scope.

58. Section 7(3), which also falls under the "**Confidentiality**" heading, is consistent with this interpretation. Section 7(3) is sub-headed "*Regulatory contacts*" and requires CUL to notify Amazon of governmental or regulatory inquiries or requests. Like section 7(2), this provision could not reasonably be understood to apply only to a confidential regulatory contact.

59. The Court concludes that the broad "**Confidentiality**" heading of section 7 "merely reflects an attempt to choose a caption that embodies an important theme of the clause . . . ." Int'l Multifoods, 309 F.3d at 86. CUL has not explained why the heading of section 7 "rather than its substance should control the Court's interpretation." In re Bank of New

York Mellon, 42 F. Supp. 3d at 526 n. 18. The Court concludes that the "**Confidentiality**" heading of section 7 does not limit the scope of section 7(2).

60. The Court concludes that Amazon had the right to terminate for cause based on the unambiguous terms of section 7(2) because CUL used the Amazon trade name in WeChat posts without first obtaining Amazon's written consent. (MTA § 5(3) ("Amazon may immediately terminate all or any part of this Agreement or a Work Order upon written notice if you violate . . . Section 7 of these General Terms.").)

61. CUL's attempt to revive the extra-contractual arguments of waiver, estoppel and election of remedies is without merit. They are not among the claims and defenses that CUL listed in the JPTO. (ECF 92.) At the Final Pretrial Conference, CUL struggled to articulate a basis for invoking waiver, estoppel and election of remedies. (See 6/9/26 Tr. at 9-10.) CUL conceded that its arguments for estoppel, waiver and election of remedies were first raised in response to Amazon's affirmative defense of material breach, which Amazon later withdrew. (Id. at 10-13.) Prior to the presentation of evidence at trial, CUL again argued that it should be permitted to present evidence that Amazon was aware of CUL's WeChat posts publicizing the parties' business relationship and took no contemporaneous action. (Trial Tr. 8-9.) But Amazon was not, itself, bringing a claim for breach of contract and instead asserted that it had the contractual right to terminate for cause. CUL's assertions of waiver, estoppel and election of remedies are procedurally defective and otherwise meritless.

62. "Proof of damages is an essential element of a claim for breach of contract under New York law." Process Am., Inc. v. Cynergy Holdings, LLC, 839 F.3d 125, 141 (2d Cir. 2016). Because CUL has not proved that Amazon breached the Work Order, the Court need not reach the issue of damages. However, if the Court had found that Amazon wrongfully

terminated the Work Order for cause, CUL has not offered evidence of its damages. At the final pretrial conference, CUL agreed that the Work Order's liquidated damages provision does not apply to termination for cause and that CUL instead "must prove damages for breach of contract." (6/9/26 Tr. at 12-13.) Before the presentation of evidence at trial, CUL stated that if Amazon were found liable, it was "entitled to a separate hearing to prove up those general damages because that is not something that has been an issue in this case." (Trial Tr. 12.) CUL's post-trial memorandum asserts for the first time that it is entitled to $47.616 million in Tender Shortfall Liquidated Damages pursuant section 5.1(b) of the Work Order. (ECF 98 at 14-15.) This damages theory was not identified in the JPTO or asserted at trial, and, as previously explained, there is no evidence that CUL made a written request for such damages as required by Schedule 3 section 5(1)(c) of the Work Order. In the event that the Court had found that Amazon wrongfully terminated the Work Order for cause there is no evidence in the trial record to support a damages award.

CONCLUSION.

The Court finds that CUL failed to prove by a preponderance of the evidence that Amazon breached the Work Order. Alternatively, Amazon has proven by a preponderance of the evidence that it properly terminated the Work Order for cause. The Clerk is respectfully directed to enter judgment in favor of defendant Amazon Services LLC, terminate all motions and close the case.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
October 23, 2026